UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENWOOD DIVISION

**DR. DAVID GLOVER,**

Plaintiff,

*v*.

**KRAFT HEINZ FOODS CO.,**

Defendant.

Case No. _____

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

*DEMAND FOR JURY TRIAL*

## I.     INTRODUCTION

This is an action arising under the employee protection provisions of the Food Safety Modernization Act (FSMA), 21 U.S.C. § 399d, by Plaintiff Dr. David Glover (hereafter "Plaintiff," or "Plaintiff") against his former employer, Kraft Heinz Foods Co. (hereafter "KHC" or "Defendant"). Defendant employed Plaintiff as a Sanitation Business Unit Leader. Plaintiff was hired by Defendant at this position on April 27, 2015, and remained in this position, or an equivalent, retitled position, until Defendant discharged him from employment on September 1, 2017.

## II.     JURISDICTION

1.      Jurisdiction of this action is established under 28 U.S.C. §1331 on the basis that this complaint arises and presents federal questions under the Food Safety Modernization Act, 21 U.S.C. § 399d.

2.      Plaintiff administratively exhausted his claims under the Food Safety Modernization Act in the United States Department of Labor, Occupational Safety and Health

Administration (OSHA), and the Office of Administrative Law Judges (OALJ). Plaintiff filed his complaint with OSHA on September 26, 2017. The Secretary of Labor issued findings on October 15, 2018, and Plaintiff filed his Request for Hearing with the OALJ on November 9, 2018, that is, within 30 days of receipt of the Secretary's findings. More than 210 days has lapsed since the filing of Plaintiff's DOL-OSHA complaint on September 26, 2017, and no final order of the Secretary of Labor has yet been issued. Consequently, Plaintiff has a right under 21 U.S.C. § 399d(b)(4)(A) to file this action *de novo* in this United States District Court.

3.    Plaintiff has provided notice to the DOL-OALJ of his intention to file his FSMA claim in this court invoking the *de novo* jurisdiction of this court pursuant to 21 U.S.C. § 399d(b)(4)(A).

### III.   VENUE

4.    Venue lies in this United States District Court under 28 U.S.C. § 1391(b) and (c) by virtue of the fact that the Defendant does business in offices located in and/or operated in this division of this judicial district, i.e., at 3704 Louis Rich Rd., Newberry, South Carolina 29108, telephone number (803) 276-5015.

### IV.   PARTIES

5.    Plaintiff was an "employee" of Defendant within the meaning of 21 U.S.C. § 399d.  On April 27, 2015, Defendant employed Plaintiff as a Sanitation Business Unit Leader. Later in 2017, Plaintiff's title changed to S Senior Sanitation Supervisor. Plaintiff remained in that position until Defendant discharged him on September 1, 2017.

6.    Defendant is a food and beverage company. Defendant is an entity engaged in the manufacture, processing, packing, transporting, and distribution of food within the meaning of 21 U.S.C. § 399d(a) as it has a plant in Newberry, South Carolina, which manufactures and

distributes meat products, including turkey meat in the forms of raw products and ready-to-eat products such as deli meats. Approximately 2,500 employees work at the Newberry plant. Plaintiff was an employee of Defendant's Newberry plant.

## V.     BACKGROUND FACTS

7.      As part of Defendant's production of turkey meat, after turkeys are slaughtered but before they are cooked, they are placed in a poultry chiller machine that holds approximately 5000 gallons of water. To sanitize the meat, Defendant adds to the chiller water an anti-microbial agent called Inspexx 150, which is manufactured and delivered by a third-party vendor named Ecolab.

8.      On or about July 27, 2017, Ecolab delivered to Defendant's Newberry Plant a tote of a chemical called Oxonia Active. Oxonia Active contains the same principal ingredients as Inspexx 150 but in more concentrated amounts. Oxonia Active is not permitted to be used in the poultry chiller, and its use therein would constitute an act of "adulteration" of food under chapter 9 of Title 21, the Federal Food, Drug, and Cosmetic Act (FDC Act).

9.      The FDC Act contains a definition of adulteration, at 21 U.S.C. § 342(a)(1), that encompasses the addition of Oxonia Active to the poultry chiller.  That definition provides in pertinent part: "A food shall be deemed to be adulterated--(1) [i]f it bears or contains any poisonous or deleterious substance which may render it injurious to health . . . ." 21 U.S.C. § 342(a)(1).

10.     According to the Safety Data Sheet for Oxonia Active 150, it is a sanitizer for food contact surfaces. It is not intended for application to food. The Safety Data Sheet warns: "Harmful if swallowed. Causes digestive tract burns." The Safety Data Sheet prescribes: "If

swallowed: Rinse mouth with water. Do NOT induce vomiting. … Get medical attention immediately." In contrast, Inspexx-150 is designated in its Safety Data Sheet as a "food additive."

11.     On August 8, 2017, an Ecolab representative, believed to be Nick Lorimer, while visiting the Newberry Plant, saw the tote of Oxonia Active that had been delivered, but which as yet had not been used by Defendant. He reported it to Tyesha Hobson, a Kraft Heinz line technician. Ms. Hobson, in turn, reported the Oxonia Active to Plaintiff.

12.     Upon notification by Ms. Hobson of the presence of the Oxonia Active in the Plant, Plaintiff undertook reasonable, proactive steps to prevent a mistaken use of the Oxonia Active in KHC's production line. Within five minutes after being informed of the Oxonia Active, at approximately 3:30 am on August 8, 2017, Plaintiff initiated calls to Vashtie Cannon, Quality Lead Tech; Jay Gibson, Maintenance Supervisor; and Kenneth Gilmore, Sanitation Supervisor. Plaintiff instructed Ms. Cannon to place a "hold notice" on the tote of Oxonia Active to prevent its mistaken use in the production process, instead of Inspexx 150. Plaintiff then instructed Jay Gibson to have a certified forklift driver take the tote from the floor and place it on the shipping dock for return to Ecolab. Mr. Gibson sent forklift driver John Peterson, who removed the tote and delivered it to the loading dock per Plaintiff's instructions.

13.     Plaintiff subsequently spoke to Mr. Lorimer, the Ecolab representative, regarding having the tote removed from the premises.  Mr. Lorimer stated that he would arrange to have it picked up and placed a call to his office to begin that process. Kenneth Gilmore and Plaintiff walked to the loading dock to verify that the tote was placed there and the hold tags were in place. Plaintiff also informed his immediate supervisor, Sanitation Manager Victor Aekins, of

the presence of the improper chemical.

14. Mr. Lorimer informed Plaintiff that he had spoken with both Aekins and Michael Caughman, KHC's Production Manager, that morning about the incident and that he would ensure that Ecolab removed the Oxonia Active from the plant.

15. At approximately 4:30 am the same morning, August 8, 2017, Glover returned to his desk to prepare an email to Mr. Caughman regarding the Oxonia Active and its near mix-up resulting from Caughman's Production Department employees placing the Oxonia Active tote near the production line. While Plaintiff was typing the email, Caughman physically walked by Plaintiff's cubicle. Plaintiff stopped him and informed him of the events of that morning. Caughman stated that he would look into it.

16. After this conversation and promise of investigation by Mr. Caughman, Plaintiff went into the production meeting room and again discussed the events with Victor Aekins, Plaintiff's Sanitation Department supervisor. Mr. Aekins stated that it was good Glover caught the mistake.

17. On information and belief, at approximately 9:00 am on August 8, 2017, Kenneth Gilmore and Plaintiff spoke again with Victor Aekins about the events of that morning.

## VI. THE ADULTERATION EVENT AND KHC'S UNLAWFUL RETALIATION AGAINST PLAINTIFF

### A. NEGLIGENCE OF KHC AND ECOLAB EMPLOYEES OTHER THAN PLAINTIFF CAUSED THE ADULTERATION EVENT

18. The foregoing events all transpired on or about August 8, 2017. Subsequently, due to apparent negligence by employees under the supervision of Mr. Caughman, Production Manager; Josh Burgess, the Associate Quality Manager; and Janice Ball, the Quality Assurance Manager, the Oxonia Active tote, which Plaintiff had caused to be placed on the Newberry

5

Plant's loading dock awaiting pickup by Ecolab, was moved from the loading dock and returned to the production line, and ultimately, on or about August 15, 2017, added to the turkey chiller. All this occurred completely unbeknownst to Plaintiff and was not due to Plaintiff's negligence, misfeasance, or to any conduct by Plaintiff whatsoever.

19. The fact that KHC employees other than Plaintiff were principally responsible for the adulteration occurrence is documented in a series of partially redacted discipline notices issued to them by KHC. These documents demonstrate the following chain of events for which other KHC employees and managers were responsible, not Plaintiff.

20. A Chiller Operator, with Employee ID No. 12396415 (whose name was redacted by KHC), was suspended on August 21, 2017. The specification of charges stated as follows:

> On Monday 8/14/17, a tote of chemicals (Oxonia Acid) was delivered to the Inspexx room. Sometime on Tuesday 8/15/17, [this Chiller Operator] hooked the chemical hoses to this tote of Oxonia Acid and ran this chemical through the plant's chiller system. On Friday, 8/16/17, the empty tote of Oxonia Acid was removed from the Inspexx room and taken to dry storage. On Saturday night, 8/19/17, it was discovered that the Oxonia Acid had been used and an investigation was started. The investigation concluded that this chemical had been mistakenly used in the Inspexx system and all of the plant's product produced from Tuesday 8/15/17 through Saturday 8/19/17 was placed on Quality hold.

The discipline notice faulted this employee for not confirming that the chemical was the proper one before introducing it into the chiller system.

21. According to this discipline notice, Employee ID No. 12396415's manager was Michael Caughman (not Plaintiff). As noted above, Plaintiff had warned Caughman about the near use of the Oxonia Active when he discovered it on August 8, 2017, and Plaintiff had caused the tote to be immediately moved to KHC's loading dock for pickup by Ecolab. Yet, the Oxonia Active tote had been moved back from the loading dock to the Inspexx room unbeknownst to

6

Plaintiff, and it was this employee, who was under Mr. Caughman's supervision, who negligently added it to the production process.

22.     Employee ID No. 12396415 was not discharged. On information and belief, Manager Caughman was not disciplined.

23.     A KHC Quality Lead Tech, Employee ID No. 12330331 (name redacted) similarly was suspended for five days, effective on August 23, 2017. The discipline notice issued to this employee stated:

> On 08/16/2017 around 10:06 am, [this Quality Lead Tech] received an email from the Ecolab rep, Nick Lorimer requesting her help in finding a tote of chemical which had been incorrectly delivered to the plant on hold. The request specifically stated "Please make sure that no one got it and used it thinking It was lnspexx 150" At 10:21 [this Quality Lead Tech] forwarded the email to Ebony Orr.
>
> This was not the first time that [this Quality Lead Tech] was notified about the tote, being at the plant. On Tuesday afternoon [that is, August 14, 2017] [this employee] was asked by Rica Woodard to assist in locating the same tote for return to the vendor.
>
> ***
>
> From the investigation it has been determined that the tote was placed into the inspexx room on 8/14/2017 but not loaded into the system until the end of the shift on 8/15/2017. Had [this employee] properly escalated the issue on 8/14/17 when the tote was deemed to be missing from where it had been, then management could have located the tank and no product would have been effected [sic]. Had she further checked the inspexx room when the Ecolab representative voiced immediate concerns, the issue could have been mitigated before product was able to leave the facility and was still a relatively small amount.
> ***
>
> This resulted in over 5 million pounds of product being placed on hold and multiple customers needing to be notified to hold product. Additionally USDA District Office notification had to be made to assist in determining the food safety risk to the product.

> During the time that the product was on hold, the plant experienced extreme business disruptions to include not shipping finished goods, excessive labor losses, holding product in two sister facilities and holding products at the distribution centers and holding products at customer locations. Product was held for almost 48 hours pending review by the corporate team, vendor and corporate toxicology groups, special situations management team and USDA district office. Had the USDA district office requested it, the facility would have had no other alternative other than recalling the affected products. Not only would this have caused significant loss to the business, but could have been harmful to the consumers who had consumed product.

KHC estimated that the Lead Tech's negligence resulted in a loss to the company exceeding $100,000. This Lead Tech was supervised by Associate Quality Assurance Manager Josh Burgess.

24.     Employee ID No. 12330331 was not discharged. On information and belief, Associate Manager Burgess was not disciplined.

25.     Ms. Vashtie Cannon, the Quality Lead Tech who tagged the Oxonia Active tote upon its discovery on August 8, 2017, was disciplined for failing to affix the proper type of tag to the Oxonia Active tote when it was found that day. Ms. Cannon was also supervised by Associate Quality Manager Josh Burgess, not by Plaintiff. Ms. Cannon was not discharged; nor on information and belief was Mr. Burgess disciplined.

26.     Ecolab, for its part, utterly failed to fulfill its duty to pick up the Oxonia Active tote for a full week after it learned of its misdelivery. Instead, on August 14, 2017, as already noted, the tote was moved from the loading dock back to the Inspexx Room. The Inspexx room is located outside of the general production area; it is where the chemicals for the chillers are stored and fed into the system. Plaintiff and his department, Sanitation, had no responsibility for this room. The Oxonia Active then was added to the turkey chiller on October 15, 2017, resulting

in adulteration of the turkey product. On information and belief, KHC did not impose any repercussions on Ecolab or Mr. Lorimer.

27.     Upon his arrival at work on the evening of Saturday, August 19, 2017, Kenneth Gilmore informed Plaintiff that the tote of Oxonia Active, which Plaintiff had caused to be moved to the loading dock on August 8, 2017 for removal back to Ecolab, was "missing" (although, by then, as described above, it had already been used in the production process). This was Plaintiff's first knowledge that the tote had never been picked up from the loading dock for removal by Ecolab.

28.     Later that night (thus, during the early morning hours of Sunday, August 20, 2017), Mr. Gilmore, Plaintiff, Shannon Coleman, Frank Cannon, and Terrence Fleming spoke by conference call with Victor Aekins regarding the missing tote. Mr. Aekins instructed these employees to search the plant for the missing tote. Others joined in the search or provided information to assist. Josh Burgess, the Associate Quality Manager, arrived at the plant to lead the search. As of the end of Plaintiff's shift, which would have been around 8:00 AM on Sunday, August 20, 2017, the tote had not been found (although, by then, as described above, it had already been used in the production process).

29.     Upon Plaintiff's arrival at the plant for his next day's shift, around midnight on Sunday, August 20, 2017, Terrence Fleming told Plaintiff that the tote had been found empty on Sunday, August 20, 2017, after Plaintiff's shift had ended. Mr. Fleming told Plaintiff that the Oxonia Active had been used in the chillers. Plaintiff was not told who had moved the chemical tote back from the loading dock to the Inspexx room, or who was responsible for using the Oxonia Active in the chillers.

30.     On the morning of August 21, 2017, after Plaintiff's night shift had ended, he was called into a meeting with Paul Wright, KHC's Newberry Plant Manager; Kat Longerbeam, the

Human Resources Manager; Janice Ball, the Quality Assurance Manager; and Victor Aekins, Plaintiff's immediate supervisor in the Sanitation Department. Janice Ball led what amounted to an inquisition of Plaintiff, falsely accusing him of being nearly single-handedly responsible for the incident. Plaintiff explained the steps he had taken to prevent the Oxonia Active from adulterating the production process, i.e., that he had Vashtie Cannon place a "hold notice" on it; had John Peterson move it by forklift to the loading dock; notified the Ecolab representative asking him to have his company remove it from the plant site; received assurances from Ecolab that it would remove it; notified his immediate supervisor, Victor Aekins, of its presence; and informed Michael Caughman, the head of Production, of its presence.

31.     By informing his superiors of the presence of the wrong chemical in the plant, Plaintiff had precisely complied with KHC's procedures. An undated, untitled list of safety policies applicable at the Newberry Plant, instructs employees like Plaintiff to:

- Report all accidents, injuries and near misses immediately to your supervisor or Lead Tech and first aid.
- Report any unsafe conditions or acts that you observe immediately to your supervisor.

Plaintiff fulfilled this safety policy when he reported the Oxonia Active to Mr. Aekins and Mr. Caughman.

32.     As noted, Mr. Aekins was present during this August 21, 2017 interrogation of Plaintiff. Plaintiff expressly informed KHC's managers that, after taking the above-described steps, "I let Vick [Aekins] know [on August 8, 2017] that . . . we had the little incident with the tote." He also said he informed Caughman. During the August 21, 2017 meeting, the managers completely ignored Mr. Aekins' (and Mr. Caughman's) responsibility for the incident. They showed no interest in questioning Mr. Aekins, even though he was there, about what he had done

10

in response to learning of the presence in the plant of the tote of Oxonia Active on August 8, 2017.

33. On August 21, 2017, Plaintiff contacted the United States Department of Agriculture's (USDA) Atlanta District Office, South Carolina Department of Health and Environmental Control (DHEC), and two non-governmental organizations, Food and Water Watch and the Consumer Federation of America, and informed them of the incident, thereby making disclosures protected under 21 U.S.C. § 399d. Indeed, an email sent by DHEC to USDA Food Safety and Inspection Service (FSIS) at 10:36 AM on Monday, August 21, 2017 states in pertinent part:

> Someone [Dr. Glover] called to make an anonymous complaint about a plant which we don't handle but [name redacted] told me to take the complaint anyway and give it to you. The caller stated that chemicals fell into the food and the plant is trying to cover it up and push it along. Kraft foods in Newberry.

34. Thus, independently of Plaintiff's direct reporting to DHEC and the Atlanta USDA office on August 21, 2017, DHEC conveyed Plaintiff's information to the FSIS that there had been an adulteration incident and the plant was attempting to cover it up.

35. Plaintiff was required to meet with KHC management again on August 22, 2017, where management again tried to pin the blame on Plaintiff for the adulteration incident, when in fact he was not responsible for it, for the reasons described above.

36. Plaintiff made a second protected disclosure, this time to the KHC ethics hotline, on August 23, 2017.

B.     **KHC ILLEGALLY RETALIATED AGAINST PLAINTIFF FOR HIS DISCLOSURES**

37.    On September 1, 2017, KHC discharged Plaintiff from employment in retaliation for his protected disclosures.

## VII. PLAINTIFF CAN MAKE A PRIMA FACIE SHOWING OF A VIOLATION OF 21 U.S.C. 399d

A.     **PLAINTIFF ENGAGED IN PROTECTED ACTIVITIES**

38.    Plaintiff's August 21, 2017 disclosures of the adulteration incident to the USDA and the South Carolina DHEC, as well as to two non-governmental organizations, Food and Water Watch and the Consumer Federation of America, and his August 23, 2017 disclosure to the KHC ethics hotline, constituted protected activity under 21 U.S.C. 399d, which provides protection for any employee who

> provided, caused to be provided, or is about to provide or cause to be provided to the employer, the Federal Government, or the attorney general of a State information relating to any violation of, or any act or omission the employee reasonably believes to be a violation of any provision of this chapter or any order, rule, regulation, standard, or ban under this chapter, or any order, rule, regulation, standard, or ban under this chapter . . . .

39.    Plaintiff disclosed events that he reasonably believed to be a violation of chapter 9 of Title 21, the Federal Food, Drug, and Cosmetic Act (FDC Act). The FDC Act prohibits the "adulteration" of food, as well as the manufacture of any food that is adulterated. 21 U.S.C. § 331(b) and (g). The FDC Act contains a definition of adulteration, 21 U.S.C. § 342(a)(1), that encompassed the addition of the Oxonia Active to the poultry chiller (i.e, "A food shall be deemed to be adulterated--(1) [i]f it bears or contains any poisonous or deleterious substance which may render it injurious to health . . . .").

12

**B.    KHC HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF PLAINTIFF'S PROTECTED ACTIVITIES WHEN IT DISCHARGED HIM**

40.    KHC had actual or constructive knowledge of Plaintiff's protected disclosures when it terminated him on September 1, 2017.

41.    Plaintiff submitted his ethics hotline complaint at 8:35 AM on August 23, 2017. The complaint shows that the "Issue Owner" was Gregory Isbell, which means that Mr. Isbell was assigned to investigate Plaintiff's complaint.

42.    Mr. Isbell was not an outside investigator from a non-interested organization; rather, he was a member of the Human Resources Department of a higher KHC corporate entity.

43.    Mr. Isbell first contacted Plaintiff on or about August 25, 2017, as part of his investigation. In the hotline complaint, Plaintiff named Paul Wright, Kat Longerbeam, Victor Aikens, and Janice Ball as being involved in the retaliation against him. It is a reasonable inference that Mr. Isbell would speak with each of these KHC managers during his investigation. Thereby, the occurrence and content of such discussions would place these managers on notice that Plaintiff had made a protected disclosure to the hotline complaining about their actions, among other things.

44.    Moreover, an employee of KHC informed Plaintiff on or about August 25, 2017, that the hotline complaint had been conveyed to KHC management. That employee told Plaintiff that Mike Caughman stated that "they" [he and other KHC managers] knew [Glover] called the hotline. The employee further stated that Mr. Caughman stated that "Dave" [Plaintiff] must not want another job and that it wouldn't take but a phone call to bad mouth "him."

45.    Thus, KHC had actual or constructive knowledge of Plaintiff's protected activity when it discharged him on September 1, 2017.

13

**C.  KHC TOOK AN ADVERSE ACTION AGAINST PLAINTIFF BY DISCHARGING HIM AFTER IT KNEW HE HAD MADE PROTECTED DISCLOSURES**

46.     Discharge from employment is an adverse action prohibited by 21 U.S.C. § 399d(a), which provides in pertinent part:

> No entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because the employee, whether at the employee's initiative or in the ordinary course of the employee's duties (or any person acting pursuant to a request of the employee)—

**D.  THE CIRCUMSTANCES ARE SUFFICIENT TO RAISE AN INFERENCE THAT THE PROTECTED ACTIVITY WAS A CONTRIBUTING FACTOR IN THE ADVERSE ACTION**

47.     A reasonable relationship between the time of the protected disclosure and the time of the personnel action establishes, *prima facie*, that Plaintiff's protected activities were a contributing factor to the personnel action.

48.     Here, KHC discharged Plaintiff on September 1, 2017, mere days after his whistleblowing disclosures on August 21 and 23, 2017.

49.     There are other circumstances showing that the protected activities were contributing factors including that KHC's discharge of Plaintiff was a deviation from its normal procedure in such a case; that KHC treated Plaintiff disparately compared to its treatment of other employees who, unlike Plaintiff, actually were culpable for the adulteration incident including managers Caughman, Burgess, and Aekins; and that KHC relied on pretextual factors to attempt to justify its discharge of Plaintiff.

## VIII. CLAIM AND DAMAGES

**COUNT I: DISCRIMINATION IN VIOLATION OF THE FOOD SAFETY MODERNIZATION ACT OF 2011, 21 U.S.C. § 399d**

50. Plaintiff realleges Paragraphs 1 through 49 above.

51. In discharging Plaintiff, Defendant violated Section 402 of the Food and Safety Modernization Act of 2011 ("FSMA"), codified at 21 U.S.C. § 399d, and the implementing regulations at 29 C.F.R. § 1987, which provide that no entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food may discharge an employee if he reports to his employer information relating to violations or perceived violations of any order, rule, regulation, standard or ban under the Food, Drug, and Cosmetic Act (FDC Act).

52. The foregoing facts demonstrate that Defendant is and was during relevant times an entity engaged in the manufacture, processing, packing, transporting, distribution, reception, holding, or importation of food within the meaning of 21 U.S.C. § 399d.

53. The foregoing facts demonstrate that Plaintiff engaged in protected activity by reporting allegations of adulteration of Defendant's turkey products in violation of the FDCA.

54. The foregoing facts demonstrate that Defendant committed a prohibited adverse act of discrimination against Plaintiff by discharging him in retaliation for his protected activity, and thereby violated the statute.

55. Defendant's termination of Plaintiff caused him actual, economic, non-economic, compensatory and special damages including but not limited to (a) damage to his career and ability to obtain the highest level employment within his industry; (b) lost wages, income, and

benefits; (c) damage to his professional reputation and interruption of his demonstrated work history; and (d) ongoing mental and emotional distress, humiliation, embarrassment, loss of self-esteem, and diminution in his enjoyment of life.

## VI.  PRAYER FOR RELIEF

56. WHEREFORE, Plaintiff requests that the Court award him the following:

a. Reinstatement to his employment with Defendant, and if reinstatement is not ordered, then front pay for a period of at least five years;

b. Upon reinstatement, an injunction directing Defendant to remediate the hostile work environment, harassment and intimidation to which it subjected Plaintiff;

c. Back pay for all lost wages and benefits, including lost bonuses;

d. Economic damages for injury to Plaintiff's career, professional reputation and earning capacity, in an amount to be determined at hearing;

e. Non-economic damages for mental and emotional distress, embarrassment and humiliation, in an amount to be determined at hearing;

f. Expungement of written warnings, reprimands, negative performance appraisals and other derogatory information and references which have been placed in the Plaintiff's personnel file;

g. Posting of a notice to Defendant's employees indicating that the Defendant has been ordered to comply with the FSMA's anti-retaliation provisions, and to make appropriate restitution to the Plaintiff;

h. Reasonable costs and attorney's fees, together with the costs of expert witnesses; and

      i.      Defendant should be ordered to provide a neutral employment reference, to include dates of employment, job title, and final wage rate, to all potential employers regarding Plaintiff in the event reinstatement is not ordered; and

      j.      All other relief that may be available from law and equity.

57.      Plaintiff demands trial by jury.

Respectfully Submitted,

BY: s/ Herbert W. Louthian, Jr.
HERBERT W. LOUTHIAN, JR.(Fed. Bar ID #2729)
1116 Blanding Street, 3rd Floor
Columbia, South Carolina 29201
PHONE: (803) 454-1200
bert@louthianlaw.com

John A. Kolar
Amanda Hitt
Government Accountability Project
1612 K Street, N.W.
Suite 1100
Washington, D.C. 20006
(202) 457-0034, Ext. 197
(No fax number)
JackK@whistleblower.org
AmandaH@whistleblower.org
Attorneys for Plaintiff